Good morning. May it please the Court, and I would note there's also a related case on appeal that we're also arguing, as I understand it, USA v. Western Radio. Okay. So especially because those two cases were consolidated, there are many issues to cover. We have 20 minutes per side, so if the Court has any specific issue you would like me to delve into, I certainly will do so. Otherwise, I'll just begin. This case is about a small, closely held corporation which has been operating a telecommunications facility on Forest Service land in Oregon for decades, with several customers that rely on his operations and 911 service and so on. After many years of litigation between Mr. Oberdorfer, Western Radio, his company, Western Radio, and the Forest Service, things have steadily gotten worse for their relationship. So we have two related cases on appeal. The issues are not, the legal issues are not related. The facts are somewhat related. So we have the Western Radio, I'm sorry, Oberdorfer and Western Radio v. Jewkes, which is a case Mr. Oberdorfer brought with Western Radio co-plaintiffs against the Forest Service for Please speak into the microphone. Yes, I will try to speak more clearly. I'm sorry. Mr. Oberdorfer and Western Radio sued the Forest Service for various actions which are alleged to have been discriminatory. He brought a Bivens claim which was dismissed on a 12B6 motion without leave to replead. He brought a NEPA claim against another facility being authorized on the mountain that was thrown out on standing grounds. And he brought a claim under 16 U.S.C. 457 for failure of the Forest Service to adequately coordinate to avoid interference with a new tower. Those claims all were brought together, but they're very different. They have significant differences. The other case involves the USA suing Western Radio for alleged breach of lease and breach of contract for beginning to build a replacement tower after he had received authorization to do so. I think maybe the most egregious legal error that was made is the dismissal of the NEPA claim on standing. There's actually a case directly on point at the Port of Astoria case from this court from 1979, which involved a broadcasting company that sued the Bonneville Power Administration under NEPA, alleging interference with what's going to be caused to its operations. But this court allowed the NEPA National Environmental Policy Act claim, saying that the proposed action would have a primary impact on the natural environment. And so that and other cases have clearly established that simply because one has business interests, that doesn't mean you can also not have here Mr. Oberdorfer, the principal of the company, has aesthetic interests that he clearly alleged in his declaration regarding the new towers that are going to be built. So I'm not sure that that's a specific concern. It is, Your Honor. But he does did allege... In particular about the, what was it, I think it was the AT&T tower? Well, what he said was that the proliferation and increasingly larger towers on Walker Mountain, which he sees every day because he lives and works in the area and he enjoys uses and enjoys the area, that that was, made him sick to see that. And that was his aesthetic reason for challenging the project. And he has never denied that he also has an economic interest because of the interference from that project to his business. But this court has never required specific details beyond that level of detail for aesthetic injury. But we do require redressability, and I don't see how a favorable decision on the NEPA claim you've brought in Mr. Oberdofer's favor, how would that redress the aesthetic injuries alleged? There's already a proliferation of towers up there. If that's a favorable decision on the NEPA claim, it's not going to change that. Well, this Court has held that incremental injury is sufficient to provide standing under NEPA. NEPA has extremely broad standing jurisdiction, jurisprudence. And the argument was that building larger towers and more towers, taller towers, which are more visible from the viewpoints below, that that would be an injury. But again, we're not talking about an injury. Sure, he's alleged that it makes him sick to see all these towers. I guess what I'm questioning is how you, whether you have alleged adequately redressability, because I just don't see, it's not as though if you were to prevail on a NEPA claim that  that's the problem I guess I have. Well, at the time the claim was brought, the tower had not been built. And what the courts have said is that redressability in particular under NEPA is extremely liberal and broad because it's a procedural injury. If the government does not address the cumulative and connected actions in properly under NEPA, then there's a procedural injury. And the plaintiff does not have to demonstrate that a different decision would be made even. So there's the NEPA claim. Then there's the dismissal of the Bivens claim on 12b-6 motion. There, of course, the court must take the facts alleged as true. The alleged actions. He had two Bivens claims? He did. One was First Amendment and one was the class of one that he was treated differently with no rational basis. The actions that he alleged, and I, so there was an earlier Bivens Western Radio case in 2009. In that case, the actions that were alleged were the type of actions that could be challenged under the APA. So they were held to be precluded by the APA under the Wilkie Supreme Court case. The actions in that case were that he was experiencing unexplained delays in processing his applications and that the Forest Service was failing to enforce the lease against other lessees, the lease provisions. In this case, the actions alleged could not be addressed under the APA. They are that the Forest Service contacted county code enforcement, which led to an unlawful prosecution. It was unsuccessful, but he did have to undergo that process because county. That's the First Amendment claim? This is one of the three actions that are alleged to violate both the First Amendment and the class of one. The first action is identifying the county that he failed to obtain a permit? That he allegedly had a duty and failed to obtain a permit, correct. The second action is that the Forest Service contacted Western Radio's customers and told them that he was not in compliance with the law and the lease. And then contacting DOJ, who ended up filing suit and also criminally prosecuting Mr. Oberdorfer, which is another case that's under appeal. These are separate from the types of APA claims, types of claims that could be challenged under the APA. They're clearly separate from the NEPA claim that was brought in this case and the Section 497 claim. The facts are all kind of interrelated, but it's not the type of claims that we could have brought under the APA. Therefore, it's not precluded under Willkie. The problem with the Forest Service's alleged compliance with 497 is that they basically rubber-stamped the AT&T application without any coordination with Western Radio after Western Radio had already obtained permission, authorization, a final decision notice to replace its tower. Even though AT&T told the Forest Service that the AT&T tower would cause interference with Western Radio's new tower, that's at AR 4514-16, and it's discussed in detail in the opening brief. And, in fact, the Forest Service called off AT&T's coordination with Western Radio when AT&T told the Forest Service Western Radio wanted more information. That's in the opening brief at 46-49 and in the ER at 4521-23. The second case, of course, is a little different. It's the USA suing the Forest Service for allegedly — I'm sorry, suing Western Radio for allegedly violating the lease and breaching contract and trespassing with — trespassing on Forest Service land. As thoroughly argued in the brief, the past practice of the Forest Service has been to allow people to replace their towers, companies to replace their towers by just updating the site map, site plan map. There has not been a requirement of amending the lease. And even if the Forest Service has encountered unauthorized new towers, which have been built without any of the process Western Radio went through, the practice has been to just tell the site user to complete the paperwork. And that's in the record at — excuse me — ER 316, 317, 324, and 348-49. Let me ask you this. As I understand it, your client's view was that that initial — what I would think of as a preliminary approval was, in fact, a final approval and that there were no further conditions that needed to be satisfied before, you know, an official go-ahead would be given. Is that — am I understanding that right? Yes, it does not say in any way that it is a preliminary approval. The 2007 decision notice says that it is authorizing a replacement tower that's in the ER at 395. And it says that construction can begin immediately. It was administratively appealed by another user. That appeal was upheld by the — sorry. That decision was upheld by the Forest Service, and it was designated as a final agency decision. There was no further action at that time that was indicated as being necessary. The lease does not state that it requires an amendment to the lease. Mr. Oberdorfer at one point suggested, if you want me to sign an amended lease, please send it to me for my review. But am I right, though, that he then — I can't remember the — I might get the years off, but I thought maybe in 2009 and 2010 he did get correspondence from folks at the Forest Service, if I'm remembering right, that indicated that they certainly thought that additional conditions needed to be complied with before construction could lawfully begin, right? There was communication indicating that he needed to do the coordination, 2700-10 technical coordination. He had already done that, and he indicated that to the Forest Service. And, in fact, when I deposed the Forest Service, they acknowledged that that is a process that is completed before the decision notice. There was no — it was AT&T who came in after the 2007 decision and said, we want to build a new structure. They are the ones that failed to give Western Radio the information necessary to do further technical coordination. As far as the issue of requiring detailed plans, that — the lease clearly says that's only if those are requested by the Forest Service. And that's not the case. The lawsuit was filed. The — sorry. So it was a de facto revocation or alleged revocation of the 2007 decision, in our view. There was final authorization. It said that work could begin immediately. It could begin at any time, I think is the wording, or something similar to that. For what page? What page? I'm just looking at it now. I don't remember those. Oh, I see. At the end is it that the project will be implemented on or after September 1, on or after September 13. On or after September 13, which is right after the decision. It will be implemented. It will. It doesn't say it will be implemented after further steps are completed. It doesn't say construction may begin immediately. It indicates to the public that construction may begin immediately. It does? Well, it indicates that it could be implemented any day after the decision, because it is a final decision. And it gives the date. I just read this as — it says it's a decision memo. It just says that there's no problem with NEPA. Well, a decision memo, as I've explained in the brief, is a — If you read it, if you just read it carefully, I mean, it talks about NEPA. You don't have to comply with NEPA. A decision memo under this Court's jurisprudence is a — It doesn't say all the other — you know, you've satisfied all the other requirements as well. It doesn't say otherwise. And a decision notice is a final agency action. I mean, what's wrong with looking at the lease? I mean, apparently, Mr. Orbedofer has extensive knowledge and familiarity with the Forest Service and how they operate. Correct? Correct. He's involved in lots of litigation. Yes. Yes, correct, Your Honor. If you look at the lease, it's pretty clear about what happened. It has to happen here. Actually, it is not. The lease doesn't require any amendment. It doesn't require detailed plans unless requested by the officer. He needs to comply with the site plan. He is. The decision notice says that it's in compliance with the site plan. The decision notice says that this project complies with the site plan. Where does it say that? Well, there was a reservation that the Forest Service held back on. Am I right? I'm sorry. I'm not sure what you're referring to. The Forest Service told your client that, yes, this looks okay, but you have to wait until we tell you to go ahead. And he didn't do that. That's not what the 2007 decision says. The decision, the September 2007 decision memo at ER 93 says these activities Try to speak a little slower and louder. Thank you, Your Honor. At ER 93, the decision memo states, I have decided to authorize the replacement. These activities are consistent with the Walker Mountain communications site plan. It just says consistent. It doesn't say in compliance. Well, the plain meaning of consistent with would be in compliance, and it doesn't indicate anywhere. I mean, I understand, at least, he's got to comply with all the regulations that pertain to the area. And as we fully briefed, he has complied. And if you're going to comply, there was compliance with the NEPA. I mean, they had to do a NEPA analysis, right? The NEPA analysis precedes the decision notice. Usually, if there's an EA or an EIS, it's a separate document. Then there's the decision notice. Was there a separate EA document prior to the decision memo? No, it was a categorical exclusion. It didn't require. It says, reasons for categorically excluding the decision. Right. It didn't require a separate NEPA document. But the NEPA analysis for the CE, the NEPA discussion under the CE was made part of the decision notice. I would like to reserve a couple or a minute and a half, 20 seconds. Thank you. Thank you very much. A minute and a half. Good morning, Your Honors. May it please the Court. My name is Sean Martin. I'm an assistant U.S. attorney, and I'm here representing Appelli, United States Forest Service, and District Ranger Holly Jukes in her official capacity. I will be speaking about the APA appeal. Assistant U.S. attorney Evans is here at council table. So if Your Honors have questions about the trespass breach of lease case brought by the United States or the Bivens claims, Mr. Evans will make that argument. I do have a question about the remedy offered or given by the district court on those claims. So maybe you can make sure to reserve a little time for your colleagues. Certainly, Your Honor. But why don't I go ahead. Please speak into the microphone, please. I will, Your Honor. Thank you. Thank you. The Walker Mountain Electronics Site is in kind of a unique location. It's at about elevation 7,000 feet. It's in a quite rural area, but it actually is centrally located for telecommunications operations because it is above all the other mountainous terrain, and it allows BPA and other public and private entities to maintain their communications facilities. It also has electricity, obviously, and roads up to its summit. So it serves a unique role. It's been in operation for probably about 40 years. And in terms of its footprint, though, it's quite small. It's about 1.9 acres of telecommunication buildings and towers, and the AT&T project that is the subject of the APA challenge is a 0.1-acre footprint. And let me turn to the AT&T APA challenge, Your Honor. Judge Simon got it right that there was a major problem with Article III standing on the NEPA claims, not the 16 U.S.C. 497, but the NEPA claims. That there certainly was evidence presented by Mr. Oberdorfer that past development at the Walker Mountain site made him sick. But there is no evidence, and this is at the summary judgment phase, there's no evidence that the AT&T tower was going to bring him an actual, imminent, concrete Article III injury. So there's a problem there, and, Your Honor, Judge Watford, you mentioned redressability, and that's also a concern. This project involves a net decrease in three towers at this site, and removal of an aged building, replacing it with a more modern one that can allow for co-location. So there are two towers that actually have gone up. They've been in operation now for about a year, since August 2013. Two towers went in, five towers came out. There's a net decrease in three towers. But beyond the lack of evidence of an actual imminent injury, I think it's very important to keep in mind that this Court has held in prior litigation involving Western Radio that alleged wireless interference is not in the zone of interest of NEPA, that it is considered an economic injury, not an environmental impact, and that is the Western Radio Services v. SB case, 79 Fed 3rd, 896. It's important to keep in mind, too, Ms. Dugan mentioned the Port of Astoria v. Hodel case from 1979. The Western Radio case discussed that prior holding and distinguished it. It's also important to keep in mind that the 1996 Western Radio ruling by this Court not only involved the same defendant, but it involved Central Oregon telecommunication facilities run by the Forest Service. This is a third point on standing, Your Honors. I don't believe this was in the government's brief, but I did want to note that this Court in 2011, in another prior case brought against Forest Management on Walker Mountain by the same plaintiffs, held that Mr. Oberdorfer and Western Radio lacked standing to bring a NEPA claim. That was an unreported decision, but that is at 433 Federal Appendix 558. The Westlaw citation is 2011, Westlaw 183-7683. What was the agency action being challenged in that case? That was a NEPA decision after an environmental assessment for construction of a BPA tower, Bonneville Power Administration. And the Ninth Circuit, this Court in 2011, held that Western Radio failed to produce evidence sufficient to show a factual issue of a concrete and actualized – pardon me, a concrete and particularized and actual and imminent. Isn't that why Mr. Oberdorfer submitted his own personal affidavit in this case? I think that may be the reason. But the problem with the declaration, Your Honor, is that it doesn't state any facts about what about the AT&T project is going to cause an environmental injury to him. Even if Your Honors don't believe that Judge Simon got it right on standing, Judge Simon did also reference his concerns about the fact that there were no NEPA concerns or environmental concerns, for that matter, that were raised during the administrative process, and therefore, there was a waiver problem for Western Radio and Mr. Oberdorfer. That's an alternate grounds to affirm Judge Simon beyond standing. And on top of that, as Judge Simon emphasized, on the merits, the NEPA claims regarding segmentation and an alleged failure to take into account cumulative effects would likely fail as well. And I don't want to belabor the briefing, but those are addressed in the Forest Service's briefing to this Court. Mr. Evans, we'll take the Bivens and the affirmative arguments to Your Honors, but I wanted to briefly address the other APA claim that Mr. Oberdorfer and Western Radio raised, and that's the U.S. pardon me, 16 U.S.C. 497 claim, which is, as the district court noted, was tethered on a single regulatory provision that was allegedly violated. And it's critical to keep in mind that this regulatory provision was a pre-application initial screening provision that requires the Forest Service to make an initial judgment call that a proposed use is not obviously incompatible and it doesn't cause unreasonable interference. Here, I think that it was quite convincing to the district court that what we have here is a telecommunications proposal by AT&T for a telecommunications facility. It seems to me that it's obviously suitable, not obviously unsuitable. But his claim was it would interfere with his tele. His concern? Well, you know, that was something the Forest Service took into account. There was a December 2010 letter from the district ranger to all of the site users where she explained that she had made the initial judgment call, but that she was going to follow the Forest Service manual, the Forest Service handbook. And if there were allegations of actual wireless interference, that she would follow the remedial procedures. There haven't been at this point, Your Honor. And it's also quite important that after the NEPA decision notice was issued on this AT&T proposal, that the Forest Service in that decision notice made very clear, we're not authorizing any construction by AT&T until AT&T goes to all of the site users at Walker Mountain and does what they call a technical coordination period. Right. And what happened here was AT&T went ahead and did that, and nobody had any concerns, including Western Radio. And it was evidence in the record that Western Radio and Mr. Overdorfer received that package of materials and did not submit any comments prior to the groundbreaking, which I was explaining occurred about a year ago. And those facilities have been up for 11 months at this point in time. So unless you have any further questions, I'll turn over the lecture to Mr. Evans on the Bivens and the affirmative claims by the United States. Okay. Good morning. Before I turn to the trespass remedy question, I would just like to give a little bit of background on what that is, that Judge Simon ordered summary judgment on both breach of lease and the trespass action, determining that there were no genuine issues of material fact, and Western Radio is not arguing that, in fact, there were genuine issues. There were cross motions for summary judgment on liability only before the district court. The district court, although the government was arguing for certain remedies, specifically instructed or allowed the Forest Service to pursue breach of contract remedies in an administrative proceeding. So the judge said, you know, the parties contemplated if there is a breach of the lease that there would be some administrative revocation proceedings, and the judge allowed the Forest to do that. The Forest Service pursued those administrative remedies. At the same time, the judge invited both parties to submit additional briefing on the appropriate remedy for what he had found to be the trespassing tower. After additional briefing and oral argument, the judge ultimately issued an opinion in order, saying there are no genuine issues of material fact as to the appropriate remedy. I'm going to basically issue a permanent injunction in order that tower to be removed. I think the judge got it right for a couple of reasons. One, it was established that it was an intentional trespass. Not intentional in terms of specific intent to commit a crime, but intentional in knowing that the conduct you were performing was going to result in a trespass. And I think the record and the breach of lease summary judgment clearly established that. So the issue really was what's the appropriate remedy when somebody knowingly places a structure on somebody else's property? Yeah, but this is not like going onto your neighbor's property and, you know, building a house or something. I mean, if I remember right, he was going to replace an existing tower of his own with this new one, right? Yes. That was the proposal. He had a lease. Right. So it's not – I mean, I don't know. I just don't find that analogy doesn't seem right. And if you look at the Swaggerty case and some of the other Oregon cases that we cite, it actually is a worse situation than building on your neighbor's property. In Swaggerty and a couple of other cases, somebody actually owns the adjacent property. They knowingly go over the property line. And the courts have said, in an intentional trespass, we don't balance the equities. We're not going to see that, well, it's going to cost you $50,000 to remove, you know, or take a foot off of your house, even though you're only encroaching over. Yeah, but let me just put it in these terms. He did get – at the very least, you have to concede he got preliminary approval to do this project, right? He got preliminary approval through the NEPA process, yes. Okay. But, I mean, he's – the defect in him going forward was just that there were additional conditions that he needed to comply with, which maybe he could still comply with, right? Well, as Judge – no. I think as Judge Simon correctly found, this wasn't just a technical oversight. No, no, no. I'm not talking about the magnitude of the conditions that he failed to comply with. I'm just saying that isn't it still possible that if he went through – if he jumped through all the hoops that he was supposed to have done before he began construction, that he might ultimately get approval and the tower, in fact, could go up just as it is now, no? The answer to that question today is no, because in subsequent litigation, Judge Simon affirmed the agency decision to revoke the lease. So at this point in time, Western Radio has no right to be up there. But the problem with – even if you – That's not the basis for the injunction here, though. No. And I thought, in fact, that the judge had declined – that's where I left off, that the judge had declined to grant the Forest Service that remedy. Now you're saying that in subsequent proceedings that happened? That's not something I was aware of. So to follow up, when the judge said, Forest Service, you may take administrative action to revoke the lease, the Forest Service did that.  The United States filed a declaratory judgment action against Western Radio because the lease says here are the respective rights of the parties. They were in dispute if this lease is revoked. Western Radio filed an APA challenge to that final agency decision, and we litigated that. And in the declaratory judgment action, the Court affirmed the revocation of the lease but stayed any result of that declaratory judgment pending, quite frankly, the outcome of this appeal, just like the judge stayed the removal of the trespassing tower. I think if you look at the judge's reasoning in his opinion, there was simply no abuse of discretion to say, Western Radio, you need to remove that trespassing tower. The Forest Service doesn't know anything about it. We don't know how the foundation was poured. We never got any architectural plans, no design plans. Did you ask for them? Pardon? Did you ask for them? Certainly in the lease revocation proceeding, the administrative proceeding. In this proceeding, did you ask for them? Not specifically because we didn't know it was being built. The district ranger writes two letters to Western Radio saying, look, we've looked through your file. It appears that you have preliminary approval for this project. If you're going to go forward, be advised that I need the following information at least before I can provide authorization. I think Judge Simon got it exactly right. If you look at the regulations, 251.61 and 251.62, it says if even as an authorized holder, at the time he was authorized to be there, if you're going to do any changes, make any amendments, any of that, you need to come back and do a new special use application. And, in fact, that's what started the whole process. Western Radio did apply for a new special use application twice, once for just the building and once for the tower. The first step in reviewing that application is going through the NEPA process. That's just the first step. Richard Obrador from Western Radio know these regulations inside and out. They didn't respond to the December 2009 letter, was noncommittal in response to the June 2010 letter, and then went and built the tower without notifying anybody or asking any questions. Counsel today is arguing that, in part, the request for more information by the district ranger was a de facto revocation of the decision memo, basically making an APA argument that, you know, in reality the district ranger had reversed course on what they view as final approval for the project. That was the opportunity. That was the allegation that they could have made to have an APA challenge to the district ranger's conduct. They didn't do that. Can I interrupt you just to ask a factual question that maybe goes to the balance of the equities? I guess I have a hard time understanding how someone can build a tower in the location you've said. How long did it take, like, a year or two to build this thing? Three months. Oh, it goes up in three months. Okay, but you can build it without anyone seeing? I mean, you said, well, we didn't even know he was building it. Really? At 7,000 feet? And that's uncontested. That is absolutely uncontested. It's at the top of a mountain. It's this particular location is at the very top. Well, we caught it right after the first two pieces were put in place. So, you know, staking the ground, excavating, pouring the rebar, all of those things are ground level. And so unless you actually drive up there and look, you will not see it. The tower itself gets delivered on a flatbed truck and is just placed on the ground, and then you have to get a crane up there and you put them in place. And so it was after that first day of installing the first two sections that we noticed that it was up there. That's when law enforcement posted a notice, said you don't have authorization to do this, which I think relates back to Bivens, although there have not been a lot of questions about it. A law enforcement officer or a district ranger passing on information about the status of an administrative proceeding cannot in any way be construed as a constitutional violation. It would be improper, irregular for the law enforcement officer or the district ranger not to make a phone call and not to make inquiries about whether or not the county had issued a permit. Certainly if anything is referred to my office, I'm going to start asking a lot of questions, such as did he have a county permit? What was the status of the ongoing administrative proceeding? So there's just no way that there's a Bivens violation based on the facts that have been alleged. Any other questions? We submit. Thank you, Your Honor. You had about a minute and a half for rebuttal. Thank you, Your Honors. Yes. They knew it was being built. They told him to stop. He stopped the very next day. He ultimately finished the job, though, correct? No. He didn't? No. So it's not operational? No, it is not operational. Was the police – was the full structure put in place? There was a final upper part that needed to be attached. They never sent Western Radio a proposed lease amendment, even though we asked them for it. That's in ER 313 and 345. As I noted, the other users were given a much different remedy. Other users who actually built towers with no application, they were just simply told to fill out paperwork, and that's in ER 316, 17, 24, 48 to 49. And so the remedy is certainly overbroad. In the Monsanto case, the Supreme Court said that an injunction is a drastic and extraordinary remedy. Can I ask you, so what impact, if any, do you think – I didn't realize that the lease had now been revoked, but what impact does that have on your argument here? Well, the revocation of the lease is the subject of a new appeal. I'm sorry, Your Honors, but we'll be back. And in large part, that is based on the alleged – the alleged trespass and breach of contract. And for that reason, because it's interrelated, Judge Simon stayed the effect of his ruling on that revocation, upholding the revocation, because he said, you know, if I'm overturned on the first appeal, then we'll have to revisit the lease revocation. So that doesn't, in my opinion, give them – change any of the dynamic here. They granted Western Radio authorization to replace their tower. They've been up there for decades. They've been serving the public. There's no reason why he wouldn't be able to complete the process. To comply fully with whatever the Forest Service wanted? Well, to – And after all this litigation, I mean, surely he must get tired of it. Would you offer to just do whatever they wanted him to do? Well, and not to go outside the record, but it will be the subject of the next appeal, which is that they started adding even more provisions that were not part of the lease, not part of the statutes, not part of the regulation. They gave him options, two options, said take it or leave it. And he said, no, I'm going to see what the court says. But certainly there have been discussions, lengthy discussions, both involving counsel and not – and without counsel trying to resolve this matter, I assure you, Your Honors. Thank you very much. Thank you. The matter is submitted.
judges: PREGERSON, PAEZ, WATFORD